UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
THE UNIVERSAL CHURCH, INC.,

                Plaintiff,

     - against -             **MEMORANDUM & ORDER**

UNIVERSAL LIFE CHURCH/ULC MONASTERY    14 Civ. 5213 (NRB)
d/b/a THE UNIVERSAL LIFE CHURCH,
UNIVERSAL LIFE CHURCH MONASTERY
STOREHOUSE, GEORGE FREEMAN, BRUCE TAYLOR,
CALVIN TOELLNER and DANIEL CHAPIN,

               Defendants.
----------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff brings this trademark infringement action in connection with its registration of various marks, including "Universal Church" and "The Universal Church."  Plaintiff asserts trademark infringement claims under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), claims under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), and state law claims for trademark infringement, unfair competition, and deceptive business practices.  See First Am. Compl. (ECF No. 15).  Both parties have moved for summary judgment.  For the reasons set forth below, we grant defendants' motion and deny plaintiff's motion.  In doing so, we hold that "Universal Church" and "The Universal Church" are generic marks and that, even if they were not, plaintiff could not establish likelihood of confusion.

<u>BACKGROUND</u>[1]

I.   **<u>Factual Background</u>**

   A.   **<u>Parties</u>**

Plaintiff, The Universal Church, Inc., is a Pentecostal/Charismatic church. Pl.'s 56.1 (ECF No. 103) ¶ 2. It was incorporated in New York on May 5, 1987, as a not-for-profit corporation and has its principal place of business in New Jersey. <u>Id.</u> ¶ 1. Plaintiff is spiritually affiliated with, but legally independent of, the Universal Church of the Kingdom of God, a Brazilian church founded in 1977. Def.'s 56.1 (ECF No. 87) ¶¶ 3-5. Plaintiff has "around 30,000 members," while plaintiff's Brazilian affiliate has millions of members. Zibas Decl. (ECF No. 91), Ex. B at 21:15-19; 144:23-25; <u>see also</u> Pl.'s Opp. MSJ (ECF No. 113) at 16.[2]

Defendant Universal Life Church Monastery Storehouse, Inc. ("ULC") was incorporated in Washington State on September 13, 2006,

---

[1] The following is taken from the parties' statements of material facts pursuant to Local Rule 56.1 and is considered undisputed unless otherwise noted. At oral argument, the parties confirmed that all material evidence had been submitted in connection with the present motions and that no additional material evidence would be presented if the case were to proceed to trial. <u>See</u> Oral Arg. Tr. (ECF No. 138) at 23:7-15.

[2] At oral argument, plaintiff's counsel disputed that plaintiff has "only" 30,000 members. Counsel claimed that the figure was "far more" but was unable to provide an alternative figure. <u>See</u> Oral Arg. Tr. (ECF No. 138) at 18:21-19:6. Given that plaintiff's own vice-president and 30(b)(6) witness affirmed the 30,000 figure, <u>see</u> Daniels Decl. (ECF No. 104), Ex. 11 at 21:15-19 ("Q How many members do you have of [*sic*] The Universal Church, Inc., church members [*sic*]? A We have around 30,000 members."), and the absence of evidence to the contrary, we take the figure as undisputed for summary judgment.

as a not-for-profit corporation.  Def.'s 56.1 (ECF No. 87) ¶¶ 16-17.[3]  Prior to that, ULC was an unincorporated association.  Id. ¶ 18.  Defendant ULC describes itself as a "a non-denominational, non-profit organization" that "recogniz[es] the importance of maintaining open hearts and minds, embracing any individual, no matter his spiritual background, who wishes to become a member of this family of faith."  Id. ¶ 30.  It offers free ordinations to its members.  Id. ¶ 31.  It is an offshoot of a church founded in California in the 1950s that was initially called the "Universal Church."  Id. ¶¶ 22, 23, 27.  There are other "Universal Life Churches" that are offshoots of the original church but are not affiliated with defendants.  Id. ¶¶ 25, 27.

Defendant Universal Life Church/ULC Monastery is affiliated with defendant ULC.  Oral Arg. Tr. (ECF No. 138) at 23:16-24:7.  The four individual defendants are current or former officers of one of the corporate defendants.  Def.'s 56.1 (ECF No. 87) ¶ 19.

---

[3] Plaintiff responded to and/or disputed several statements in defendants' 56.1 statement by noting that it "lacks information sufficient to form a belief as to the truth of this unverified assertion."  See, e.g., Pl.'s Opp. 56.1 (ECF No. 114) ¶¶ 16-18, 22-23.  We treat such statements as undisputed for purposes of summary judgment.  See S.D.N.Y. LR 56.1(c) ("Each numbered paragraph in the statement of material facts . . . will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); id. 56.1(d) ("Each statement by the . . . opponent . . . , including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible . . . .").

B.   <u>Trademarks at Issue</u>

This lawsuit involves three trademarks registered by plaintiff: "Universal Church," "The Universal Church," and "Universal Church of the Kingdom of God."[4]  Two of the marks—— "Universal Church" and "Universal Church of the Kingdom of God"—— were registered in January 2006.  Def.'s 56.1 (ECF No. 87) ¶¶ 38, 47.  The marks were registered with the United States Patent and Trademark Office (the "USPTO") for use in "evangelistic and ministerial services, namely, conducting religious worship services."  Pl.'s 56.1 (ECF No. 103) ¶ 5(a), (b).  The registration certificates state that the marks were first used in commerce in May 1987.  Def.'s 56.1 (ECF No. 87) ¶¶ 39, 48.  In February 2012, the USPTO issued Notices of Acceptance under Sections 8 and 15 of the Lanham Act granting incontestable status to the marks.  <u>Id.</u> ¶¶ 41, 50.

The third mark, "The Universal Church," was registered in April 2012 and has not reached incontestable status.  <u>Id.</u> ¶¶ 43, 46.  It is registered for use in "religious counseling and ministerial services," "newsletters and informational brochures all about religious beliefs and practices," and "t-shirts

---

[4] Plaintiff's motion papers reference a fourth mark, "*The* Universal Church of the Kingdom of God," registration number 3,930,709.  <u>See</u> Pl.'s 56.1 (ECF No. 103) ¶ 5(d) (emphasis added).  Defendants object to its consideration since it was not identified in the first amended complaint as a trademark at issue.  In any event, no such mark appears to exist.  The mark that is registered under number 3,930,709 is "Universal Church of the Kingdom of God," without a preceding "The."  <u>See</u> Daniels Decl. (ECF No. 104), Ex. 7.

distributed in connection with religious groups." Pl.'s 56.1 (ECF No. 103) ¶ 5(c).

In 2009, defendants attempted to register "Universal Life Church" and several similar marks. The USPTO rejected the mark on the grounds that there was a likelihood of confusion with other registered applications, including "Universal Church" and "Life Church." Although defendants were afforded the opportunity to submit evidence and arguments in response, they instead choose to abandon their applications.[5]

### C.   **Defendants' Use of the Trademarks**

Plaintiff claims that defendants use the trademarks at issue in one of five general ways: (1) by registering domain names, including universalchurch.org, containing the phrase "universal church"; (2) by using the "Universal Church" on the universalchurch.org website; (3) by using the "Universal Church" in the website's metadata so that the website's name shows up as "The Universal Church" in search results; (4) by bidding on advertising keywords, including "the universal church," so that defendants' websites appear in Internet search engine ads; and (5) by "hijacking" map-based searches so that defendants' website is

---

[5] Having found the parties' submissions on this point lacking, we take judicial notice of the defendants' trademark applications, which are available on the USPTO's website, http://tmsearch.uspto.gov.  See Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J., 894 F. Supp. 2d 288, 301 n.6 (S.D.N.Y. 2012), as amended (Sept. 19, 2012) (taking judicial notice of online trademark registration information).

associated with the location of plaintiff's churches.  These uses are explained in greater detail below.

### 1.   Registering Domain Names that Incorporate "Universal Church"

Defendants registered 17 domain names containing the phrase "universal church."  Pl.'s 56.1 (ECF No. 103) ¶ 18.  The domain name that is central to this lawsuit is universalchurch.org, which defendants registered in 2010.  Id. ¶ 24.[6]  The domain names were all registered by defendants between 2009 and 2013.  Id. ¶¶ 21-29.

### 2.   Use of "The Universal Church" on Defendants' Websites

Defendants used the phrase "universal church" in various ways on the website hosted at universalchurch.org.  For example, the mark appears at the website's top left corner and in the website's text, as shown below:

---

[6] Defendants also registered universalchurch.co, universalchurch.info, universalchurch.mobi, universalchurch.mx, universalchurch.net, theuniversalchurch.org, universalchurchoflife.org, universalchurchonline.com, universalchurchonline.net, univeralchurchonline.org, universalchurchsupplies.com, universalchurchsupplies.net, universalchurchsupplies.org, universalchurchsupply.com, universalchurchsupply.net, universalchurchsupply.org.  See Pl.'s MSJ (ECF No. 102) at 7 n.2.



Pl.'s 56.1 (ECF No. 103) ¶ 36 (screenshot of universalchurch.org homepage taken on January 5, 2014); <u>see also</u> <u>id.</u> ¶¶ 31-33 (screenshots and descriptions of website's content on different dates).   At various times, the website also included a link to defendants' website, themonastery.org, through which defendants offer online ordination services.   <u>Id.</u> ¶ 30.

Plaintiff also claims that the website contained "defamatory content" about the founder of the Universal Church of the Kingdom of God, <u>id.</u> ¶ 40, and explained that "'Universal Church' is a registered trademark.  The sponsor of this website is the Universal

Life Church, unaffiliated with the legally recognized trademark holder, 'Universal Church, Inc.,'" id. ¶ 31.[7]

### 3.   Use of "The Universal Church" in Website Metadata

Defendants have also used "The Universal Church" as the "title tag" in the HTML metadata for universalchurch.org.  The effect is that a search result for the website appears as follows:



Pl.'s 56.1 (ECF No. 103) ¶ 40 (screenshot of partial Google search result).

### 4.   Bidding on "Universal Church" as a Keyword Search Term

Plaintiff next claims that defendants bid on certain keyword search terms in order to place "pay-per-click" ads.[8]  Pl.'s 56.1

---

[7] Defendants argue that plaintiff's screenshots of the universalchurch.org website, which are taken from archive.org's Wayback Machine, have not been authenticated under Federal Rule of Evidence 901.  However, plaintiff submitted with its reply an affidavit from an archive.org employee, see Daniels Decl. (ECF No. 125), Ex. 1, which courts in this Circuit have generally accepted as sufficient for authentication purposes, see, e.g., Foster v. Lee, 93 F. Supp. 3d 223, 231-32 (S.D.N.Y. 2015); Mahmood v. Research in Motion Ltd., No. 11 CIV. 5345 KBF, 2012 WL 242836, at *4 n.2 (S.D.N.Y. Jan. 24, 2012).  In addition, courts have taken judicial notice of screenshots taken from the Wayback Machine under Federal Rule of Evidence 201.  See, e.g., Distributorsoutlet.com, LLC v. Glasstree, Inc., No. 11-CV-6079(PKC)(SLT), 2016 WL 3248310, at *2 (E.D.N.Y. June 10, 2016).

[8] Search engines such as Google generally return two types of search results: "organic" results and ads.  Organic results are those that the search engine's algorithm believes are most relevant to the particular search.  Ads, in contrast, are bought by bidding on a particular keyword, such that an ad appears above the organic search results when someone searches for that keyword.

(ECF No. 103) ¶ 43.   Defendants do not dispute that they bid on the phrase "the universal church," but do dispute that they bid on "universal church" and "universal church of the kingdom of god." Def.'s Opp. 56.1 (ECF No. 121) ¶ 43.[9]

### 5.   "Hijacking" Location-Based Search Results

Finally, plaintiff claims that the search results for its physical church locations in location-based search engines have become associated with defendants' websites, a process known as "hijacking."   Pl.'s 56.1 (ECF No. 103) ¶¶ 46-48.   For example, plaintiff claims that the Google Maps search result for its church at 1077 Southern Boulevard in the Bronx was linked to defendants' website, themonastery.org, as shown below:



---

[9] Plaintiff relies on the testimony of an employee of the company that optimized defendants' search optimization strategy.   The employee was asked whether the list of words that defendants bid on "include[s] Universal Church, The Universal Church, *or* the Universal Church of the Kingdom of God."   Zibas Decl. (ECF No. 91), Ex. BB at 17:21-24 (emphasis added).   The employee responded affirmatively, but given the disjunctive framing of the question, it is not clear whether he was testifying that defendants had bid on all three marks or at least one mark.   The employee later did clarify that defendants had bid on at least "the universal church."   Id. at 20:4-6.

9

Id. ¶ 47.   Plaintiff's expert claims to have found 290 such instances.   Id. ¶ 46.   However, the parties dispute whether defendants are responsible for the hijacking and whether any such hijacking is attributable to defendants' "use" of the trademarks in question.   Compare Pl.'s 56.1 (ECF No. 103) ¶ 46, with Def.'s Opp. 56.1 (ECF No. 121) ¶ 46.

## II.   **Procedural Background**

Plaintiff filed suit on July 11, 2014, see Compl. (ECF No. 2), and filed its first amended complaint on November 18, 2015, see First Am. Compl. (ECF No. 15).   The first amended complaint asserts three types of claims: (1) that defendants' use of plaintiff's trademarks constitutes trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a); (2) that defendants' registration of certain domain names violates the federal Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); (3) that defendants have engaged in deceptive business practices in violation of Sections 349 and 350 of the New York General Business Law; and (4) that defendants' conduct constitutes trademark infringement and unfair competition under New York state common law.   See id.

Defendants answered the first amended complaint on January 12, 2015, and also brought counterclaims seeking (1) a declaratory judgment that plaintiff's trademarks are invalid and unenforceable; (2) cancellation of the marks; and (3) a declaratory

judgment that defendants have not infringed on plaintiff's trademarks even if they are valid.  See Answer (ECF No. 24).

Both parties moved for summary judgment.  See ECF Nos. 84, 92.  We heard oral argument on the parties' motions on July 11, 2017, and allowed both parties to file post-oral argument supplemental briefs.  See ECF Nos. 133, 137.

**DISCUSSION**

## I.   **Summary Judgment Standard**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' when it might affect the outcome of the suit under governing law."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  A genuine dispute exists if a reasonable factfinder could decide in the nonmoving party's favor.  Id.

A court must resolve all ambiguities and draw all justifiable factual inferences in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The moving party must "make a prima facie showing that it is entitled to summary judgment."  Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986). If the moving party puts forth such a showing, the party opposing summary judgment must then present "sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party."

Liberty Lobby, 477 U.S. at 249.

## II.  **Federal Trademark Claims**

Plaintiff asserts federal trademark infringement claims under Sections 1114(1) and 1125(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a).  We analyze claims brought under either provision by applying a well-established two-prong test:  We determine, "first . . . whether the plaintiff's mark is entitled to protection, and second . . . whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."  Virgin Enterps. Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003).

### A.  **"Universal Church" Is Generic and Not Entitled to Trademark Protection**[10]

Defendants first argue that "Universal Church" is not entitled to protection because it is a generic rather than descriptive mark.

### 1.  Standard

Potential trademarks are divided into five categories of distinctiveness that reflect the degree, in ascending order, to which they are eligible to be trademarked and protected: (1)

---

[10] Defendants conceded at oral argument that they are not contesting whether "Universal Church of the Kingdom of God" is generic.  See Oral Arg. Tr. (ECF No. 138) at 2:7-10.  Given the similarity between "The Universal Church" and "Universal Church" marks, we treat them interchangeably unless noted otherwise.

generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful.  <u>Abercrombie & Fitch Co. v. Hunting World, Inc.</u>, 537 F.2d 4, 9 (2d Cir. 1976).[11]  As the Second Circuit has noted, however, "[t]he lines of demarcation . . . are not always bright." <u>Id.</u>

"A descriptive mark describes a product's features, qualities or ingredients in ordinary language, or describes the use to which a product is put." <u>Genesee Brewing Co. v. Stroh Brewing Co.</u>, 124 F.3d 137, 142 (2d Cir. 1997) (internal quotation marks omitted) (citations omitted).  Such a mark "may be registered only if the registrant shows that it has acquired secondary meaning, *i.e.*, it has become distinctive of the applicant's goods in commerce." <u>Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.</u>, 469 U.S. 189, 194 (1985); 15 U.S.C. § 1052(e), (f).  The USPTO "may accept as prima facie evidence that the mark has become distinctive . . . proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f).

In contrast, a "generic mark is generally a common description of goods, one that refers, or has come to be understood as referring, to the genus of which the particular product is a

_____

[11] The last three categories, which are inapplicable here, are "'inherently distinctive,' and are automatically entitled to protection under the Lanham Act." <u>Genesee Brewing Co. v. Stroh Brewing Co.</u>, 124 F.3d 137, 143 (2d Cir. 1997).

species." <u>Genesee Brewing Co.</u>, 124 F.3d at 143 (internal quotation marks omitted) (citations omitted).  "Generic names use common words that are synonymous with the nature of the organization." <u>Cancer Research Inst., Inc. v. Cancer Research Soc'y, Inc.</u>, 694 F. Supp. 1051, 1055 (S.D.N.Y. 1988).  In other words, a generic mark is one that answers the question "What are you?" while a valid trademark answers "Who are you?"  <u>See</u> 2 McCarthy on Trademarks and Unfair Competition § 12:1 (4th ed.).  "Because they serve primarily to describe products rather than identify their sources, generic terms are incapable of becoming trademarks, at least in connection with the products that they designate."  <u>Bos. Duck Tours, LP v. Super Duck Tours, LLC</u>, 531 F.3d 1, 14 (1st Cir. 2008).

"Generic terms are not registrable, and a registered mark may be canceled at any time on the grounds that it [is] generic."  <u>Park 'N Fly</u>, 469 U.S. at 193-94; <u>see also</u> 15 U.S.C. § 1064(3).  A mark may be cancelled regardless of whether the USPTO has deemed it "incontestable."  <u>See Park 'N Fly</u>, 469 U.S. at 195.[12]

To determine whether a mark is generic, the Lanham Act directs courts to consider the mark's "primary significance" to the "relevant public."  15 U.S.C. § 1064(3).  Thus, a "mark is not generic merely because it has *some* significance to the public as

---

[12] A registrant's right to use a mark is deemed "incontestable" if, after the mark has been registered for five years, the registrant files an affidavit with the USPTO stating, among other things, that the registrant's use of the mark has been continuous for five years.  <u>See</u> 15 U.S.C. § 1065.

an indication of the nature or class of an article.  In order to become generic the *principal* significance of the word must be its indication of the nature or class of an article, rather than an indication of its origin." Genesee Brewing Co., 124 F.3d at 144 (internal quotation marks omitted).[13]

"Types of evidence to be considered in determining whether a mark is generic include: (1) dictionary definitions; (2) generic use of the term by competitors and other persons in the trade; (3) plaintiff's own generic use; (4) generic use in the media; and (5) consumer surveys." Pilates, Inc. v. Current Concepts, Inc., 120 F. Supp. 2d 286, 297 (S.D.N.Y. 2000); accord Tiffany & Co. v. Costco Wholesale Corp., 994 F. Supp. 2d 474, 482 (S.D.N.Y. 2014).

    2.  Burden

As an initial matter, the parties dispute who bears the ultimate burden of proving that "Universal Church" is generic.

Although the party seeking to enforce a trademark generally bears the burden of establishing that it has a valid trademark, registering a mark creates a presumption of validity.  See Reese Pub. Co. v. Hampton Int'l Commc'ns, Inc., 620 F.2d 7, 11 (2d Cir. 1980).  That presumption, however, only extends to the class of products and services listed in the registration statement.  See

---

[13] The test for genericness is the same whether a mark becomes generic or is generic *ab initio*.  See Genesee Brewing Co., 124 F.3d at 144.

<u>Gameologist Grp., LLC v. Sci. Games Int'l, Inc.,</u> 838 F. Supp. 2d 141, 153–54 (S.D.N.Y. 2011) ("[T]he presumption of an exclusive right to use a registered mark extends only to the goods and services noted in a registration certificate."), <u>aff'd</u>, 508 F. App'x 31 (2d Cir. 2013).  Therefore, the question of who bears the burden turns on whether plaintiff is attempting to enforce its trademark within the class of services for which it was registered.

The "Universal Church" trademark is registered for "evangelistic and ministerial services, namely conducting religious worship services."  We interpret this class broadly,[14] and find that defendants' use of the trademark falls within it.[15] While it is true that defendants are not a traditional church, their core business is ordaining ministers, which is a "ministerial

---

[14] Beyond the expansive language used in the class definition, a broad interpretation is supported by the fact that plaintiff's counsel disclaimed that the word "evangelistic" limited the class's scope.  Oral Arg. Tr. (ECF No. 138) at 4:13-24.  Moreover, plaintiff has attempted to enforce its trademarks against a wide range of religious (and apparently even some non-religious) organizations, suggesting that it also interprets the class broadly.  <u>See</u> Daniels Decl. (ECF No. 123), Ex. 4 (cease-and-desist letters sent to, among others, The Universal Church, Inc., One Life Universal Church, Universal Church of Metaphysics, Inc., Universal Church of God, Inc., Universal Church of Fellowship, American Universal Church, Inc., First Universal Church of Knowledge, Universal Church of God in Christ, Inc., Universal Church of Truth Consciousness, Universal Church of Baba's Kitchen, Inc., Maxam Universal Church, Pentecostal Universal Church, The Universal Church of God Inc., Universal Church of Salvation, Universal Church of God, Universal Church of the Living God, Universal Church of God and Action, Universal Church of God and Christ, Universal Church of God in Christ, Inc., Universal Church of Jesus Christ, Universal Church of Olodumare, Inc., Universal Church of Christ, Inc., The Universal Church of Mind-Body Enlightenment, and The Universal Church Assembly of First-Born).

[15] We find the same with respect to "The Universal Church" mark, which is registered for use in "religious counseling and ministerial services," among other things.  Pl.'s 56.1 (ECF No. 103) ¶ 5(c).

service."   See "Ordain," Merriam-Webster's Collegiate Dictionary
(10th ed. 1996) (defining "ordain" as "to invest officially . . .
with ministerial or priestly authority").   Accordingly, plaintiff
is entitled to a presumption of validity, *i.e.*, that its "Universal
Church" mark is not generic.

    3.  Application

Despite this presumption, we find that "universal" is generic
as applied to churches.   The following facts are not genuinely in
dispute.[16]   First, defendants presented evidence that "universal"
is understood as referring to the entire Christian Church or all
Christians collectively.   For example, the Oxford English
Dictionary includes a definition of "universal" as "[d]esignating
the whole Christian Church or all Christians collectively; =

---

[16] In considering the evidence, we keep in mind that test for genericness
is the mark's primary significance to the "relevant public."   15 U.S.C.
§ 1064(3).   Since plaintiff has registered the mark for "evangelistic and
ministerial services, namely, conducting religious worship services," the
relevant public is extremely broad and includes all those who seek out and
provide religious worship services, including all Christians.   We therefore
reject plaintiff's argument that the relevant public should be construed
narrowly as only Pentecostal and Charismatic Christians.   See Pl.'s Supp. Mem.
(ECF No. 133) at 4 n.6; cf. Pl.'s Opp. MSJ (ECF No. 113) at 8, 21.

The parties also dispute whether "consumer" surveys are relevant to the
question of genericness.   While the relevant public here does not include
"consumers" as that word is used in sense of a commercial product or service,
we see no reason why the parties could not have conducted surveys of how the
relevant public understands plaintiff's mark.   Nevertheless, the failure to
produce a survey is not fatal, especially since defendants claim that the mark
was generic *ab initio*.   See Miller Brewing Co. v. Joseph Schlitz Brewing Co.,
605 F.2d 990, 995 (7th Cir. 1979) (consumers surveys not necessary to establish
"the meaning of a familiar English word"); Horizon Mills Corp. v. Qvc, Inc.,
161 F. Supp. 2d 208, 213 (S.D.N.Y. 2001) (where "the term was generic before
the seller used it," "[a]n individual challenging the mark need only establish
that the term is generic through an examination of the term itself").

CATHOLIC . . . Freq. in *universal church*." Zibas Decl. (ECF No. 91), Ex. N.  As the dictionary notes, "universal" in this sense has a similar meaning to "catholic," id., which is simply the transliteration of the Greek word for "universal," "καθολικός" or "katholikos." "Catholic," Oxford English Dictionary Online (June 2017).

While the parties disagree on how widespread this understanding is, they agree that it is well-established within the Roman Catholic Church and that at least some non-Catholics understand and use the term in this sense.  See Zibas Decl. (ECF No. 91), Ex. R at 30 ("[T]he phrase 'Universal Church' is a standard, hallowed usage in the Catholic Church as well as in many other Churches to refer to the Church as a world-wide reality."); Irvin Decl. (ECF No. 96), Ex. A at 9 ("[The term 'universal church'] refers specifically to the Roman Catholic Church in Catholic teachings, and is part of the claim made in official Roman Catholic theology that other churches or communions are not even 'churches' in a proper sense."); id. at 5 (recognizing "occasional" use of the term by Lutherans and Methodists); see also Def.'s 56.1 (ECF No. 87) ¶¶ 75-76.[17]

---

[17] To the extent that plaintiff argues that a word's historic use is irrelevant to whether it is generic, plaintiff is wrong.  See, e.g., Harley Davidson, Inc. v. Grottanelli, 164 F.3d 806, 810-11 (2d Cir. 1999) (examining historic use of "hog" in finding that it was generic as applied to motorcycles); E. Air Lines, Inc. v. N.Y. Air Lines, Inc., 559 F. Supp. 1270, 1274-76 (S.D.N.Y. 1983) (analyzing historic use of "shuttle" in finding that it was generic).

Moreover, "universal" has been used in this sense for hundreds of years, and even thousands of years if the original Latin and Greek versions are considered. See Zibas Decl. (ECF No. 91), Ex. N; see generally id., Ex. R.

Second, defendants presented evidence that numerous churches use "universal" and "universal church" in their name. See Def.'s 56.1 (ECF No. 87) ¶¶ 87-89.  For example, defendants' search of organizations registered to do business in New York shows that the "Universal Church of the Spirit, Inc." was registered in 1935, the "Universal Church of God, Fire Baptized, Inc." was registered in 1945, the "Universal Church of Christ" was registered in 1980, the "Universal Church Development Corp." was registered in 1981, and the "Universal Church of Life" was registered in 1997.  See Zibas Decl. (ECF No. 91), Ex. X.  Similarly, defendants' search of organizations registered to do business in California shows that "The Universal Church of the New Birth" was registered in 1966, the "Universal Church of God and Institute of Applied Religious Sciences" was registered in 1983, and the "Universal Church of Religious Freedom" was registered in 1989.  See id.  Neither list is exhaustive.  Defendants produced similar search results for Florida, Georgia, Louisiana, Maryland, Massachusetts, New Jersey,

and Pennsylvania, identifying almost 100 active or inactive entities using "universal church" in their names.  Id.[18]

Third, "universal" is used in the name of the denomination, Unitarian Universalism, see Def.'s 56.1 (ECF No. 87) ¶ 62, while "universal's" etymological counterpart, "catholic," is used in the name of the largest Christian denomination, the Roman Catholic Church.

In contrast, there is little evidence that the relevant public understands "Universal Church" as referring to plaintiff, despite the fact that the USPTO registered the mark as having achieved secondary meaning and subsequently granted it incontestable status.  For example, plaintiff claims that it uses the mark in connection with its 230 physical locations and weekly broadcasts that reach 800,000 people.  See Pl.'s 56.1 (ECF No. 103) ¶¶ 7, 9-11.  This claim is based largely on the testimony from plaintiff's own employees.  See, e.g., Daniels Decl. (ECF No. 104), Ex. 11 at 83:19-84:2 ("[W]e promote this brand, this name all over the media, our locations, even in front of each location of ours.  We always try to promote the name of the church and the buildings we own and we lease.  I would say that the Universal Church is pretty much known as the church as we are."); id., Ex. 12 at 38:19-21 ("[W]e

---

[18] Plaintiff's argument that there is no evidence that these entities are recognized by consumers or use "universal church" in commerce, see Pl.'s Opp. MSJ (ECF No. 113) at 18, is undermined by the fact that plaintiff sent cease-and desist letters to similar organizations, see supra n.13.

use ['Universal Church'] when we evangelize, when we have brochures, flyers, newspapers, tee shirts."); <u>id.</u> at 39:2-10 ("I believe that when you use the words Universal Church, everyone thinks of us.  Q. And what makes you say that?  A. Just because, Universal Church, everybody knows it as us.  That's the name we use when we do advertising, when we do T.V. programs, it's all over the place and has been in the United States since 1987.").[19] However, "little probative value" attaches to such testimony because "[t]rademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark." <u>Self-Realization Fellowship Church v. Ananda Church of Self-Realization</u>, 59 F.3d 902, 910 (9th Cir. 1995); <u>see also</u> <u>Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.</u>, 478 F. Supp. 2d 340, 370 (E.D.N.Y. 2007) (same).[20]

---

[19] Apart from the newsletter discussed below, plaintiff submitted no documentary evidence showing that it uses the "Universal Church" mark on brochures, flyers, newspapers, or tee shirts.

[20] Much of the testimony that plaintiff cites is also irrelevant because it does not specifically address plaintiff's use of the "Universal Church" mark or distinguish between plaintiff's use of "Universal Church" versus "Universal Church of the Kingdom of God."  <u>See, e.g.,</u> Daniels Decl. (ECF No. 104), Ex. 11 at 21:5-14 ("Q Is there more than one location?  A Yes  Q How many locations does The Universal Church, Inc. have?  A We have around 230.  Q Are those locations all in the U.S.?  A Yes."); <u>see also</u> <u>id.</u> at 29:22-32:18, 30:11-32:18, 34:9-36:4, 47:13-18, 72:14-22, 83:12-84:2, 86:20-23; <u>id.</u>, Ex. 13 at 23:7-13, 43:6-44:9.

There is also little documentary evidence to support the
claim. Plaintiff submitted the below photograph, which shows "The
Universal Church" mark on one of its churches:



See Daniels Decl. (ECF No. 123), Ex. 15.[21] Plaintiff also submitted
a newsletter that it publishes called "Universal News," which
contains sporadic references to the "Universal Church" in the text
and a Facebook link to "Like us: The Universal Church":

---

[21] Plaintiff submitted three other photographs of its church fronts, but
one of the photographs is indiscernible and the other two use the Spanish
version of the "Universal Church of the Kingdom of God" name rather than
"Universal Church." See Daniels Decl. (ECF No. 123), Ex. 15.



Edition 68   Visit us at: universal.org/usa/en   Like us: The Universal Church   Follow us: USA_Universal

## Bishop Edir Macedo

**The idea that there are 'little sins' and 'big sins' is completely false**

# Different kinds of sin

Sin is a transgression committed by man against God, and could be an act or a condition.

The idea that there are 'little sins' and 'big sins' is completely false because all sins are serious and, without repentance, can lead to condemnation in hell.

However, the way the Almighty handles each sin reveals that there are different kinds and criteria. If this were not so, the Bible would not detail these faults and their consequences.

Let's take a look at the examples below to differentiate them better:

David's reign was already established and he had many victories. But while the kings were with their troops in the war, he preferred to stay in the palace and rest. His idleness gave birth to adultery and the pregnancy of the wife of his most loyal soldier, Uriah.

To hide his sin, David lied, schemed and had him killed.

Uriah's life led to the death of four of David's children. This is same punishment he suggested the prophet Nathan apply to the "rich man who took the poor man's lamb" (2 Samuel 12.1-7).

David gave into the temptation of the flesh and sinned. Though his repentance brought him forgiveness, it didn't exempt him from reaping the evil he sowed. He suffered shame in the same palace terrace, was cruelly betrayed and the sword of death struck his family.

Years later, this man, who learned firsthand the consequences of disobedience, sinned again.

David ignored the instructions of the Law on the census and decided to conduct it with vain purposes. He was living a time of many personal achievements and felt exalted by them. He wanted to measure his strength and know the size of his army. Because of his pride, he ignored the fact that his victories came from the Most High.



Now sin was born in his spirit, and there would be hefty consequences. Out of three punishments, he received the permission to choose the one that would come upon Israel. That's right! The entire nation would also suffer due to his transgression. Sin brings pain to you and to others.

David saw the Angel of the Lord kill, with a plague, seventy thousand men.

The man, who had God as his ally, now had Him as his Sentencer, bearing a sword in His hand (1 Chronicles 21.16). The heavens that poured down blessings were now pouring down death.

He turned to the Most High with a broken and repentant spirit. He obtained mercy, and the plague ceased, once he built an Altar and sacrificed. The Altar he turned away from by sinning was now the only place where he would find Salvation.

On both occasions, David found God's forgiveness, because he truly repented. The eternal consequences of his actions were erased. However, the earthly consequences were not.

The difference between David's two sins is that the first was committed by a weakness of the flesh, when he gave into temptation. The second was spiritual, when he trusted more in his own strength than in the Provision of God.

Opportunities to sin arise all the time, and they happen to everyone, but we must remember that sin is a rebellion against God, especially when it is committed by people who have knowledge of the Holy Scriptures.

Even if human eyes do not see it or qualify it as serious, a sin is a sin, no matter its intensity.

## WWW.BISHOPMACEDO.COM

See Daniels Decl. (ECF No. 123), Ex. 8.

Plaintiff was also unable to substantiate its claim that its weekly broadcast reach 800,000 figure, see Zibas Decl. (ECF No.

117), Ex. A at 2 (letter from plaintiff's counsel to defense counsel noting that plaintiff was "not aware of any written documentation [regarding the weekly viewership of plaintiff's services] at this time"), a figure that appears high given that plaintiff only has approximately 30,000 U.S. members.

But even if we were to accept plaintiff's claim that plaintiff uses the "Universal Church" mark in connection with its physical churches and broadcasts, it does little to show how the mark is understood by the vast majority of the "relevant public" who do not belong to plaintiff's church.  With respect to those individuals, the only evidence in plaintiff's favor appears to be two articles referring to plaintiff as the "Universal Church."  See Zibas Decl. (ECF No. 91), Ex. EE (N.Y. Post article); Daniels Decl. (ECF No. 123), Ex. 23 (N.Y. Times article).[22]  Thus, we find that there is virtually no evidence in the record that anyone in the relevant public, outside plaintiff's own members, understands "Universal Church" as referring to plaintiff.

---

[22] Again, the record contains numerous other articles that are irrelevant, either because they do not use the "Universal Church" name or because they refer to plaintiff's Brazilian affiliate rather than plaintiff.  See Zibas Decl. (ECF No. 91), Ex. EE; Daniels Decl. (ECF No. 123), Ex. 6.  Likewise, plaintiff points to an entry in The New International Dictionary of Pentecostal and Charismatic Movements for the "Universal Church of The Kingdom of God" that uses the shorthand "Universal Church" to refer to the subject of the article.  See Daniels Decl. (ECF No. 123), Ex. 17.  But as plaintiff concedes, the entry describes plaintiff's Brazilian affiliate, not plaintiff.  See Pl.'s Opp. MSJ (ECF No. 113) at 5.

Based on this record, we hold that the primary significance of "universal church" to the relevant public is a type of church rather than plaintiff, namely one that considers itself to be universal in the sense of representing the entire Christian church. See Self-Realization Fellowship Church, 59 F.3d at 909-10 (finding that "Self-Realization Fellowship Church" was generic because the "evidence suggests that a 'Self-realization' organization is a class of organization dedicated to spiritual attainment in the manner taught by Yoga, not an organization that is part of [plaintiff's] chain of churches"); see also Rudolph Int'l, Inc. v. Realys, Inc., 482 F.3d 1195, 1198 (9th Cir. 2007) ("Our review of the record amply supports the district court's conclusions [that 'disinfectable' as applied to nail files is generic].  The district court correctly found that the term 'disinfectable' has a history of established use as a generic adjective within the nail care industry as well as in other fields such as medicine and dentistry. For example, the district court noted that 'disinfectable' is included in at least 25 patents issued since 2001."); Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 80-81 (7th Cir. 1977) (finding that "light" had "been widely used in the beer industry for many years" to describe certain beer characteristics, that such use "long antedated" plaintiff's, and concluding that "even if Miller had given its light beer a characteristic not found in other light beers, it could not acquire the exclusive right to

use the common descriptive word 'light' as a trademark for that beer").[23]

In reaching this holding, we are guided by the policies behind trademark law.  See E. R. Squibb & Sons, Inc. v. Cooper Labs., Inc., 536 F. Supp. 523, 527 (S.D.N.Y. 1982) ("[W]hether a term is generic or descriptive as applied to a particular article should be resolved by reference to the policies for refusing any protection to some terms . . . .").

By their very nature, trademarks give holders a monopoly over the right to use certain terms in describing their products or services.  However, trademark law is not intended to create

> a monopoly over a particularly effective marketing phrase.  Instead the law grants a monopoly over a phrase only if and to the extent it is necessary to enable consumers to distinguish one producer's goods from others and even then only if the grant of such a monopoly will not substantially disadvantage competitors by preventing them from describing the nature of their goods.  Accordingly, if a term is necessary to describe a product characteristic that a competitor has a right to copy, a producer may not effectively preempt competition by claiming that term as its own.

---

[23] The fact that "Universal" does not name a religion is not dispositive. Although some courts have applied such a test, see Gen. Conference Corp. of Seventh-Day Adventists v. McGill, 617 F.3d 402, 413 (6th Cir. 2010); TE-TA-MA Truth Found.--Family of URI, Inc. v. World Church of Creator, 297 F.3d 662, 666 (7th Cir. 2002), there are many ways to classify a church other than by the religion it practices.  For example, "Spanish church" would surely be generic as describing a category of Spanish-language churches, even though there is no denomination known as the "Spanish Church."  Cf. GMT Prods., L.P. v. Cablevision of N.Y. City, Inc., 816 F. Supp. 207, 210-13 (S.D.N.Y. 1993) (holding that the "Arabic Channel," as a channel broadcasting in Arabic, was generic).

*Genesee Brewing Co.*, 124 F.3d at 144 (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 305 (3d Cir. 1986)); *see also* *CES Pub. Corp. v. St. Regis Publ'ns, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975) ("To allow trademark protection for generic terms, *i.e.*, names which describe the genus of goods being sold, even when these have become identified with a first user, would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are."); *cf.* *Miller Brewing Co.*, 561 F.2d at 80-81 ("Other brewers whose beers have qualities that make them 'light' as that word has commonly been used remain free to call their beer 'light.'  Otherwise a manufacturer could remove a common descriptive word from the public domain by investing his goods with an additional quality, thus gaining the exclusive right to call his wine 'rosé,' his whiskey 'blended,' or his bread 'white.'").

Here, finding that "universal church" is generic would grant plaintiff a monopoly over the word "universal" as used in church names, a monopoly which plaintiff has already indicated that it would enforce aggressively.  *See* *supra* n.13 (listing cease-and-desist letters sent by plaintiff).  We are persuaded that the trademark law is simply not intended to allow the mark to be weaponized by plaintiff in this way.[24]

---

[24] Plaintiff argues that if "universal" is generic as applied to churches, then the Episcopal Church, the Presbyterian Church, and the Catholic Church

27

Finally, we note that our holding does not turn on the fact that plaintiff is a non-profit church rather than a for-profit company.  As the parties agreed at oral argument, there is no separate trademark law that applies to non-profits or religious organizations.  <u>See</u> Oral Arg. Tr. (ECF No. 138) at 14:19-24.  And as plaintiff points out, church names frequently receive trademark protection.  <u>See</u> Pl.'s Supp. Mem. (ECF No. 133) at 4 n.5.  However, even a cursory examination of the church names that have been registered reveals that they are far more distinctive than "Universal Church."  <u>Id.</u>[25]

**B.    There Is No Likelihood of Confusion**

Even if we were to find that "Universal Church" is descriptive rather than generic, plaintiff's trademark claims would still fail because no reasonable juror could find a likelihood of confusion.

1.   <u>Standard</u>

To prevail on its federal trademark claims, plaintiff must show that there is a likelihood of confusion as to the origin or sponsorship of defendants' services.  <u>Virgin Enters. Ltd.</u>, 335

---

must also be generic names.  Whatever the merits of that argument, we need not and, indeed, cannot decide it on the record before us.

[25] Examples of church names that have been trademarked include the Church of Religion of God, Divine Church of God, The World's Church of the Living God, Church of God Ministry of Jesus Christ, The United States Church, The Lord of the Universe Church, The Church of Good Karma, Church of God in Christ, Living Church of God, True Jesus Church, Church of the King, Christ's Sanctified Holy Church, The Episcopal Church, New Apostolic Church, and United Church of God and Worldwide Church of God.  <u>See</u> Pl.'s Supp. Mem. at 4 n.5.

F.3d at 146.  Likelihood of confusion exists when "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." Mushroom Makers, Inc. v. R. G. Barry Corp., 580 F.2d 44, 47 (2d Cir. 1978).

To determine whether there is a likelihood of confusion, we apply the multi-factor balancing test articulated by Judge Friendly in Polaroid Corporation v. Polarad Electronics Corporation, 287 F.2d 492, 495 (2d Cir. 1961). See New Kayak Pool Corp. v. R&P Pools, Inc., 246 F.3d 183, 185 (2d Cir. 2001). The Polaroid factors are (1) the strength of the mark; (2) evidence of actual confusion; (3) the sophistication of the relevant public; (4) the degree of similarity between the two marks; (5) the proximity of the services; (6) the likelihood that the prior owner will bridge the gap between its services and defendants'; (7) defendants' bad faith; and (8) the quality of defendants' services. Polaroid, 287 F.2d at 495.

Plaintiff bears the ultimate burden of establishing confusion at trial. See Medisim Ltd. v. BestMed LLC, 910 F. Supp. 2d 591, 606 (S.D.N.Y. 2012) ("Generally speaking, establishing that probability is the plaintiff's burden, which means that the defendant typically does not need to disprove a likelihood of confusion." (footnotes omitted)).

"Summary judgment based on likelihood of confusion under the Polaroid analysis is appropriate where the undisputed evidence would lead only to one conclusion." Luv N' Care, Ltd. v. Walgreen Co., 695 F. Supp. 2d 125, 132 (S.D.N.Y. 2010) (internal quotation marks omitted). The issue "is not how many factors favor each side but whether a reasonable trier of fact might differ as to likelihood of confusion." Id.

### 2.   Strength of Plaintiff's Trademark

Even if we were to find that "Universal Church" is descriptive rather than generic, we would still find it to be a weak mark.

"When determining whether a . . . descriptive mark is a strong one for purposes of the Polaroid inquiry, we look to the secondary meaning that the mark has acquired." The Sports Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 961 (2d Cir. 1996). "Secondary meaning attaches when the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 390 (2d Cir. 1995) (internal quotation marks omitted). In determining whether a mark has acquired secondary meaning, courts have considered (1) length and exclusivity of use; (2) advertising expenditures; (3) consumer studies linking the product to product source; (4) sales success; (5) unsolicited media coverage of the product; (6) attempts to plagiarize. See Thompson Med. Co. v.

Pfizer Inc., 753 F.2d 208, 217 (2d Cir. 1985).  Even where a mark has achieved incontestable status, "independent indicia of strength [are] relevant to deciding whether the strength of the mark weighs in favor or against a finding of likelihood of confusion under Polaroid."  The Sports Auth., 89 F.3d at 961.

We find that there is little evidence that "Universal Church" has acquired a strong secondary meaning as referring to plaintiff. As discussed above, plaintiff has neither used the mark exclusively nor as long as many other churches; the phrase "universal church" has been used for millennia to refer to the entire Christian Church or Christian community, as well as in the name of numerous other churches; "universal" is used in the name of the Christian denomination, Unitarian Universalism; and the word's etymological counterpart, "catholic," is used in the name of Christianity's most populous religion.  See supra at 17-20.

In contrast, plaintiff has only been using the mark since 1987, only has 30,000 members, and there is little evidence in the record that anyone outside plaintiff's church refers to it as the "Universal Church."  See supra at 21-25.

With respect to media coverage, we noted above that there are only two articles in the record that refer to plaintiff by the "Universal Church" name, while the remaining articles in the record either refer to plaintiff by its longer name or to plaintiff's Brazilian affiliate.  See supra at 25.

None of the remaining factors to be considered in analyzing secondary meaning are helpful to plaintiff. There is no evidence in the record regarding plaintiff's advertising expenditures. See Def.'s 56.1 (ECF No. 87) ¶ 138. Nor is there any evidence that plaintiff's mark has been widely plagiarized. See Pl.'s Opp. MSJ (ECF No. 113) at 19-20.[26] Although plaintiff claims that it occasionally publishes and sells books, audiovisual materials, and other items incidental to its ministry, see Pl.'s Opp. 56.1 (ECF No. 114) ¶ 6, there does not appear to be any evidence of the amount of such sales or that the materials use the "Universal Church" mark. Finally, while plaintiff conducted a survey, the survey was intended to measure confusion rather than whether the relevant public associates the "Universal Church" mark with plaintiff. See Cornerstone Decl. (ECF No. 114), Ex. A at 6; Pl.'s Opp. 56.1 (ECF No. 114) ¶ 127 ("People were told that they were looking for information about a church called 'The Universal Church' even if they had no prior knowledge of Plaintiff.").

Accordingly, we find that the "Universal Church" mark is weak.[27]

---

[26] Plaintiff argues that defendants' conduct at issue here constitutes an instance of plagiarism. See Pl.'s Opp. MSJ (ECF No. 113) at 19-20. However, as discussed below in the context of whether defendants acted in bad faith, see infra at II.B.7, we find that there is little evidence that defendants intentionally copied plaintiff's mark. Moreover, a single example hardly constitutes widespread plagiarizing.

[27] As a result, the USPTO should not have registered the mark or subsequently granted it incontestable status. See Park 'N Fly, 469 U.S. at 193-94 (A "descriptive" mark "may be registered only if the registrant shows

3.   <u>Evidence of Actual Confusion</u>

Although plaintiff claims that there is "overwhelming" evidence of actual confusion, we find that there is little to none in the record.  At most, plaintiff's evidence suggests that someone searching the Internet for "universal church" will sometimes land on defendants' website.  However, the evidence generally fails to establish (1) that this occurs because of defendants' use of the "Universal Church" mark or (2) that individuals searching for "universal church" are actually searching for plaintiff.  More importantly, there is *no* evidence that anyone purchasing defendants' ordination services was confused by defendants' alleged use of "Universal Church."

Plaintiff's evidence consists of a survey, testimony from its 30(b)(6) witness and plaintiff's expert, and a Facebook message. Plaintiff's survey attempts to measure the extent to which someone googling "the universal church" would believe that he had landed on a website for an entity called "The Universal Church."  <u>See</u> Cornerstone Decl. (ECF No. 114), Ex. A.  However, we find the survey of limited value since the survey takers were simply told that they were searching for a generic entity named "The Universal

---

that it has acquired secondary meaning, *i.e.*, it has become distinctive of the applicant's goods in commerce." (emphasis added)); <u>see also</u> 15 U.S.C. § 1052(f) (The USPTO "may accept as prima facie evidence that the mark has become distinctive . . . *proof of substantially exclusive . . . use* thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made." (emphasis added)).

Church," without any attempt to measure whether the survey takers associated such an entity with plaintiff.   See id.; Pl.'s Opp. 56.1 (ECF No. 114) ¶ 127.

Plaintiff's vice president and 30(b)(6) witness testified that "many" of its pastors and members "had a hard time trying to reach our correct Web site while they were searching for our domain."  See Daniels Decl. (ECF No. 104), Ex. 11 at 69:9-14; id. at 72:22-73:4.[28]  As an initial matter, the testimony is entitled to little weight since it comes from defendants' vice-president, an interested party.  See Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc., 198 F.3d 1143, 1152 (9th Cir. 1999) ("Evidence of secondary meaning from a partial source possesses very limited probative value."); Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d 340, 370 (E.D.N.Y. 2007) (same).  Moreover, such testimony is simply too vague to establish that anyone was actually confused between the services that plaintiff and defendants offered or that such confusion resulted from defendants' use of plaintiff's trademarks, as opposed to, for

---

[28] Defendants argue that the testimony is inadmissible hearsay.  However, the Second Circuit has permitted testimony describing other individuals' confusion in trademark cases on the grounds that the testimony is not being offered for the truth of the matter asserted, but rather to show the consumers' state of mind.  See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 1003-04 (2d Cir. 1997).

example, defendants' non-infringing search optimization strategies.[29]

Plaintiff also points to a message that it received on its Facebook page from an individual who mistakenly believed that he had been ordained by plaintiff in 1972, well before plaintiff's church was in operation.  Pl.'s 56.1 (ECF No. 103) ¶ 52; Daniels Decl. (ECF No. 104), Ex. 13 at 41:13-42:16.  However, the individual did not say who he believed he had been ordained by, and therefore it is impossible to know whether his confusion even involves defendants.

Finally, plaintiff claims that defendants' expert found five instances of actual confusion and testified that he could find a "much, much, much, much, much higher number" if given additional time.  See Daniels Decl. (ECF No. 104), Ex. 18 at 80:15-18. However, contrary to plaintiff's characterization, the expert was describing instances where individuals "refer[red] to the defendants by the misnomer Universal Church."  Id. at 78:15-80:18; see also Zibas Decl. (ECF No. 91), Ex. CC at 22 ("There are several

---

[29] Such confusion might be relevant to "initial interest confusion," something neither party addressed in their briefing.  See Savin Corp. v. Savin Grp., 391 F.3d 439, 462 n.13 (2d Cir. 2004) ("[Initial interest confusion] arises when a consumer who searches for the plaintiff's website with the aid of a search engine is directed instead to the defendant's site because of a similarity in the parties' website addresses.").  However, we question whether initial interest confusion is even relevant here.  See Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1149 (9th Cir. 2011) ("[B]ecause the sine qua non of trademark infringement is consumer confusion," even under an initial interest confusion theory, "the owner of the mark must demonstrate likely confusion, not mere diversion.").

examples where people, without any prompting or connection with Defendant, will refer to the Defendant as 'Universal Church' by unintentionally omitting the word 'life' from Defendant's name."). Such "confusion" is not relevant to plaintiff's trademark claim because "universal church" is not being used in any way to refer to plaintiff.[30]

### 4.   Similarity of the Trademarks

Defendants are using the same words that comprise plaintiff's mark.  Accordingly, this factor favors plaintiff.

### 5.   Proximity of the Services in the Marketplace

In considering proximity, "direct competition between the products is not a prerequisite to relief"; at the same time "products that share the same channel of trade are not necessarily proximate."  The Sports Auth., 89 F.3d at 963 (internal quotation marks omitted).  This factor favors defendants.  Although both parties are nominally churches, they offer different services. While plaintiff is a traditional church offering spiritual

---

[30] In the defendants' expert's examples, "universal church" was used to refer either to defendants or to the Roman Catholic notion of a universal church.  See Zibas Decl. (ECF No. 91), Ex. CC at 22 (website discussing legal opinion that "take[s] note of the unconventional methods of becoming ordained as a minister via the Universal Church Life Website"); id. (question posted on a forum ndnation.com, which describes itself as "The independent voice of Notre Dame Athletics," asking whether, "As a Catholic, is it possible to become ordained through some sort of universal church without renouncing my commitment to Catholicism?"); id. at 23 (comment to an online article discussing Representative Nancy Pelosi's views on Catholicism where the comment refers to Rep. Pelosi as a "self proclaimed Theologian & Doctor of the Universal Church"); id. at 23-25 (websites identifying various wedding officiants who were ordained by defendants but described themselves as being ordained by the "Universal Church" or the "Universal Church of Light").

services to its members, defendant primarily offers online
ordinations so that its members can perform weddings and other
religious ceremonies for non-members, something plaintiff does not
do.  See Zibas Decl., Ex. B at 67:25-68:12 ("Q Does Universal
Church offer the same services as the defendants?  A . . . I read
in their Web site that they offer some strange way to ordain people
online which is completely different than we usually do as a
church.  Q So Universal Church doesn't offer ordinations; is that
correct?  A We don't offer ordinations online.").

### 6.   Likelihood that the Plaintiff Will "Bridge the Gap"

"The term 'bridging the gap' is used to describe the senior
user's interest in preserving avenues of expansion and entering
into related fields."  C.L.A.S.S. Promotions, Inc. v. D.S.
Magazines, Inc., 753 F.2d 14, 18 (2d Cir. 1985).  This factor
favors defendants.  As just noted, plaintiff does not currently
offer online ordination and there is no indication that it will do
so in the future.

### 7.   Defendants' Bad Faith

"Under this factor, we look to whether the defendant adopted
its mark with the intention of capitalizing on plaintiff's
reputation and goodwill and any confusion between his and the
senior user's product."  The Sports Auth., 89 F.3d at 964 (internal
quotation marks omitted).  Although we believe this factor favors

defendant, a reasonable juror could come out either way.  On one hand, plaintiff does not contest defendants' right to use the name "Universal Life Church," and therefore defendants have a legitimate, good faith reason to use "universal" and "church" in their search engine optimization strategies.  Moreover, it is difficult to imagine what benefit or motive defendants would have to trade off plaintiff's goodwill.[31]  On the other hand, a reasonable juror could find that defendants' use of the mark "universal church" in various domain names, on their website, in metadata, and in search terms, could be construed as evidence of an intent to capture Internet users looking for plaintiff's organization.  Because a reasonable juror could find this factor in either parties' favor, we assume that it points in plaintiff's favor for purposes of summary judgment.

    8.  <u>Quality of Defendants' Services</u>

"Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product."  <u>Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.</u>, 991 F.2d 1072, 1079 (2d Cir. 1993)

---

[31] When asked at oral argument, plaintiff's counsel could only suggest that defendants were "vindictive" because they were denied their trademark application by the USPTO.  Oral Arg. Tr. (ECF No. 138) at 28:10-18.  However, this theory amounts to little more than speculation, which courts will not consider on summary judgment.  <u>See Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 12 (2d Cir. 1986) ("Nor may a party rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.").

Plaintiff argues that defendants' ordination services are inferior because they allow anyone to become ordained online without committing to a particular teaching or faith, without formal education, without training, and without committing to attend to the spiritual needs of others. See Pl.'s MSJ (ECF No. 102) at 25. On the other hand, the features that plaintiff views disparagingly are likely the very features that defendants' customers value. Thus, we find that defendants' services are not inherently inferior. Moreover, there is no evidence in the record that defendants are taking advantage of plaintiff's public goodwill. Accordingly, we find that this factor favors defendants.

### 9. Sophistication of the Relevant Public

This factor also favors defendants. As discussed above, the relevant public is the audience for religious worship services. Such individuals are unlikely to confuse plaintiff's religious services——offered in its physical churches and through weekly broadcasts——with defendants' online ordination services.

### 10. Conclusion

In sum, the majority of the factors point in defendants' favor: (1) the "Universal Church" mark is weak; (2) there is little to no evidence of actual, actionable confusion; (3) the parties' services are not in close proximity; (4) it appears unlikely that plaintiff will "bridge the gap"; (5) defendants' services are not inferior; and (6) the relevant public is sufficiently

sophisticated so as not to be confused.  In contrast, only two factors——the similarity of the marks and evidence of bad faith——favor plaintiff for purposes of summary judgment.  Based on this balance, we find that there is no likelihood of confusion as a matter of law.  See, e.g., Medici Classics Prods., LLC v. Medici Grp., LLC, 683 F. Supp. 2d 304, 314 (S.D.N.Y. 2010) (granting summary judgment to defendant under Polaroid where only two factors pointed "weakly" in plaintiff's favor).  Accordingly, we hold that even if "Universal Church" were descriptive rather than generic, plaintiff's trademark infringement claims would still fail.

## III. **Federal Cybersquatting Claim**

"To successfully assert a claim under the [Anticybersquatting Consumer Protection Act], a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark." Webadviso v. Bank of Am. Corp., 448 Fed. App'x 95, 97 (2d Cir. 2011); see also 15 U.S.C. § 1125(d)(1)(A).

Because we found that the "Universal Church" mark is generic and therefore not "distinctive," see supra II.A, plaintiff's cybersquatting claim must fail as well.  However, even if "Universal Church" were not generic, plaintiff's primary

cybersquatting claim would still fail because the mark was not distinctive *at the time* universalchurch.org was registered.

As noted above, a descriptive mark is only considered "distinctive" if it has acquired secondary meaning, see Park 'N Fly, Inc., 469 U.S. at 194, *i.e.*, it has come through use to be "uniquely associated with a single source," PaperCutter, Inc. v. Fay's Drug Co., 900 F.2d 558, 564 (2d Cir. 1990). Secondary meaning must be acquired "before [plaintiff's] competitor commenced use of the mark." Id.

The primary domain name at issue, universalchurch.org was registered by defendants in 2010, Pl.'s 56.1 (ECF No. 103) ¶ 24, well before the "Universal Church" mark achieved incontestable status in February 2012, id. at ¶ 5(a). Accordingly, the mark's incontestable status is irrelevant to the mark's degree of distinctiveness when defendants' registered the domain name. For the reasons set forth above——and especially in light of the long and varied use of "universal" by churches, see supra at 17-20——we find that "Universal Church" had not acquired secondary meaning as referring to plaintiff at the times universalchurch.org was registered in 2010.[32]

---

[32] A similar argument would apply to most of the remaining domain names, all but two of which——universalchurch.net and theuniversalchurch.org——were registered after February 2012. See Kent Decl. (ECF No. 95), Ex. 1 ¶¶ 84-97.

## IV.  **New York Unfair Competition Claims**

Because the standards for New York common law unfair competition and trademark infringement claims are essentially the same as under the Lanham Act, see Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 220 F. Supp. 2d 289, 297-98 (S.D.N.Y. 2002), we dismiss plaintiff's New York common law claims for the same reasons as above.

## V.  **New York General Business Law Claims**

Plaintiff asserts claims under Sections 349 and 350 of the New York General Business Law (the "NYGBL"). NYGBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). NYGBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." Id. § 350. "To successfully assert a claim under either section, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (internal quotation marks omitted).

Although only plaintiff moved for summary judgment on its NYGBL claims, we nevertheless grant summary judgment to defendants and dismiss the claims because they fail as a matter of law.[33]

"[T]he majority view in this Circuit is that trademark or trade dress infringement claims are not cognizable under §§ 349 and 350 of the New York General Business Law unless there is a specific and substantial injury to the public interest *over and above ordinary trademark infringement* or dilution." Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd., No. 07 CIV.6959 (DAB), 2009 WL 4857605, at *8 (S.D.N.Y. Dec. 14, 2009) (internal quotation marks omitted) (alterations omitted); see also Kaplan, Inc. v. Yun, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014) ("[C]ourts in New York have routinely dismissed trademark claims brought under Sections 349 and 350 as being outside the scope of the statutes, because ordinary trademark disputes do not pose a significant risk of harm to the public health or interest and are

---

[33] "A *sua sponte* grant of summary judgment against the moving party is permissible only if 'the facts before the district court were fully developed so that the moving party suffered no procedural prejudice' and 'the court is absolutely sure that no issue of material fact exists.'" Donachie v. Liberty Life Assur. Co. of Bos., 745 F.3d 41, 45 n.3 (2d Cir. 2014) (quoting Bridgeway Corp. v. Citibank, 201 F.3d 134, 139 (2d Cir. 2000)) (alteration omitted). Where the moving party has not been "denied the opportunity to place all relevant evidence in the record," a grant of summary judgment for the nonmoving party is "not procedurally deficient." Id.  Here, as noted above, plaintiff conceded that it has placed all relevant evidence in the record.  See supra n.2.

therefore not the type of deceptive conduct that the statutes were designed to address." (internal quotation marks omitted)).[34]

Here, plaintiff's NYGBL claims are merely duplicative of its trademark claims and therefore do not allege an injury to the public interest "over and above" ordinary trademark infringement.

Plaintiff argues that it has alleged an injury to the public beyond ordinary trademark confusion in that defendants' "promotion of their ordination services" under the "Universal Church" mark "injures consumers 'because they are inadvertently purchasing a product of inferior quality, a product they do not prefer, or both.'"  Pl.'s MSJ (ECF No. 102) at 28 (quoting Zip Int'l Grp., LLC v. Trilini Imports, Inc., No. 09-CV-2437 JG VVP, 2010 WL 648696, at *6 (E.D.N.Y. Feb. 22, 2010)).

---

[34] Plaintiff cites two cases, George Nelson Found. v. Modernica, Inc., 12 F. Supp. 3d 635 (S.D.N.Y. 2014), and Zip Int'l Grp., LLC v. Trilini Imports, Inc., No. 09-CV-2437 JG VVP, 2010 WL 648696 (E.D.N.Y. Feb. 22, 2010), reflecting the minority position that ordinary trademark infringement allegations may be sufficient to state claims under NYGBL §§ 349 and 350.  Besides being in the clear minority, the decisions are entitled to little weight as they fail to recognize the majority position or even analyze whether ordinary trademark infringement claims may be brought under Sections 349 and 350.  Moreover, the court in Zip International subsequently backed away from its position.  As Judge Gleeson recognized in a later opinion in the same case, "[s]ome courts have held that trademark cases fall outside the scope of the New York's consumer protection statute, reasoning that the public harm that results from trademark infringement is too insubstantial to satisfy the pleading requirements of § 349.  Thus, Zip's allegations may not even be actionable under the asserted provisions of New York law, an issue I need not address here."  Zip Int'l Grp., LLC v. Trilini Imports, Inc., No. 09-CV-2437 JG VVP, 2011 WL 2132980, at *9 n.10 (E.D.N.Y. 2011 May 24, 2011) (internal quotation marks omitted) (citations omitted).  Accordingly, we do not believe these cases warrant rejecting the majority position.

However, there is no evidence in the record to support these allegations, which, frankly, we find implausible.  We are confident that defendants' customers knew exactly what they were purchasing when they obtained free online ordinations and were unlikely to mistakenly believe they were ordained by plaintiff.  Moreover, even if confusion existed, the injury is precisely the type of injury that results from ordinary trademark confusion and does not constitute a separate public injury.  See DO Denim, LLC v. Fried Denim, Inc., 634 F. Supp. 2d 403, 409 (S.D.N.Y. 2009) (assertion that "Defendant's use of Plaintiff's designs causes injury to the public because 'the consuming public needs to be free from competitive practices that deceive and therefore complicate consumers' purchase decisions'" was "no different from the type of 'injury' alleged in any garden variety trade dress infringement claim").

Plaintiff also argues that defendants' conduct is distinguishable from ordinary trademark infringement because defendants have been "bombarding New Yorkers searching for The Universal Church online with advertisements for Defendants' ordination services (which are not legally valid everywhere in the State)" and "have caused significant harm to the public interest by willfully attacking a duly registered trademark and attempting to render it invalid, rather than challenging it through legitimate channels."  Pl.'s Reply MSJ (ECF No. 124) at 11-12.  Again—

assuming that plaintiff is referring to defendants' search engine advertisements—we find that there is no evidence in the record that defendants' consumers have been injured and, even if there were, "[t]he alleged 'deceptive acts of practices' . . . are precisely the acts that constitute the alleged trademark infringement, which are outside the scope of the statutes." Kaplan, Inc. v. Yun, 16 F. Supp. 3d 341, 352-53 (S.D.N.Y. 2014) (citations omitted).

Accordingly, we grant summary judgment for defendant on plaintiff's NYGBL claims.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment (ECF No. 84) is granted, plaintiff's motion (ECF No. 92) is denied, and plaintiff's complaint is dismissed. This Memorandum and Order resolves docket numbers 84 and 92.

Defendants are directed to submit a proposed judgment on notice by August 15, 2017.

**SO ORDERED.**

Dated:  New York, New York
        August 8, 2017

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

46